United States District Court
For the Northern District of California

1

2

3

4

5

6                   IN THE UNITED STATES DISTRICT COURT

7                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9   PHILADELPHIA INDEMNITY INSURANCE )   Case No. 12-cv-01811-SC
    COMPANY,                         )
10                                   )   ORDER DENYING CROSS RULE 702
                   Plaintiff,        )   MOTIONS AND DENYING MOTION FOR
11                                   )   SUMMARY JUDGMENT
        v.                           )
12                                   )
    BROAN-NUTONE, L.L.C.; et al.,    )
13                                   )
                   Defendants.       )
14                                   )
                                     )
15                                   )
                                     )
16                                   )
    _____)
17

18

19  I.  **INTRODUCTION**

20        Now before the Court are Defendants Broan-Nutone, L.L.C.

21  ("Broan-Nutone") and A.O. Smith Corporation's ("AO Smith") motions

22  to exclude (ECF No. 57) and for summary judgment (ECF No. 53), and

23  Plaintiff Philadelphia Indemnity Insurance Company's ("Philadelphia

24  Indemnity") motion to exclude (ECF No. 75).  All three motions are

25  fully briefed.[1]  The Court held hearings regarding the motions to

26  _____
    [1] ECF Nos. 54 ("SJ Mot."), 67 ("SJ Opp'n"), 70 ("SJ Reply"), 58
27  ("Defs.' 702 Mot."), 66 ("Pl.'s 702 Opp'n"), 69 ("Defs.' 702
    Mot."), 75 ("Pl.'s 702 Mot."), 81 ("Defs.' 702 Opp'n"), 82 ("Pl.'s
28  702 Reply").

exclude on February 20, 2015, and deems the motion for summary judgment appropriate for determination without further oral argument pursuant to Civil Local Rule 7-1(b).  For the reasons set forth below, all three motions are DENIED.

## II.   BACKGROUND

This insurance action is essentially a product liability case. In April of 2011, a fire severely damaged an apartment building, known as Franciscan Towers, in the Tenderloin District of San Francisco.  Plaintiff Philadelphia Indemnity insured the owner of the building and paid a multimillion dollar claim.  Philadelphia Indemnity alleges that the fire was caused because a ventilation fan wired into the ceiling of the bathroom of one of the apartments overheated and started the fire.  The fan that Philadelphia Indemnity suspects started the fire (the "subject fan") was manufactured by Defendant Broan-Nutone.

It is undisputed in this case that the subject fan did not work properly for at least sixteen months before the fire. Philadelphia Indemnity's theory of the case is that the blades of the fan were locked in place by debris that collected in the fan. This is known as a "locked rotor condition."  Because the fan was wired to the light switch in the bathroom, whenever the tenants turned on the light, the motor in the fan began running, even though the blades could not turn.  Philadelphia Indemnity asserts that as the motor struggled to turn the locked fan blades, the motor overheated and ignited.  According to Philadelphia Indemnity, the motor got hot enough to ignite lint that had collected on the motor or plastic parts of the motor itself.  Defendants dispute

**United States District Court**
For the Northern District of California

that the fan was in a locked rotor condition, but they argue that

even if the motor were in a locked condition, it could not have

gotten hot enough to start the fire.

Each party has retained an expert to testify about the heat of

the subject motor.  Defendants have moved under Federal Rule of

Evidence 702 to exclude the testimony of Philadelphia Indemnity's

expert, and Philadelphia Indemnity has moved, pursuant to the same

rule, to exclude the testimony of Defendants' expert.  See Defs.'

702 Mot., Pl.'s 702 Mot.  Defendants have also moved for summary

judgment on the grounds that, were the Court to exclude

Philadelphia Indemnity's expert, Philadelphia Indemnity would be

unable to prove its claims for product liability and negligence.

See SJ Mot.

## III.  LEGAL STANDARD

### A.  Summary Judgment

Entry of summary judgment is proper "if the movant shows that

there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a).  Summary judgment should be granted if the evidence would

require a directed verdict for the moving party.  Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 251 (1986).  "A moving party

without the ultimate burden of persuasion at trial -- usually, but

not always, a defendant -- has both the initial burden of

production and the ultimate burden of persuasion on a motion for

summary judgment."  Nissan Fire & Marine Ins. Co., Ltd. v. Fritz

Cos., Inc., 210 F.3d 1099, 1102 (9th Cir. 2000).

"In order to carry its burden of production, the moving party

must either produce evidence negating an essential element of the
nonmoving party's claim or defense or show that the nonmoving party
does not have enough evidence of an essential element to carry its
ultimate burden of persuasion at trial." Id.  "In order to carry
its ultimate burden of persuasion on the motion, the moving party
must persuade the court that there is no genuine issue of material
fact." Id.  "The evidence of the nonmovant is to be believed, and
all justifiable inferences are to be drawn in his favor."
Anderson, 477 U.S. at 255.

   B.   **Admissibility of Expert Opinions**

     Federal Rule of Evidence 702 permits an expert qualified by
knowledge, skill, experience, training, or education to testify in
the form of an opinion if (1) his scientific, technical, or other
knowledge will be helpful to the trier of fact; (2) the testimony
is based on sufficient facts or data; (3) the testimony is the
product of reliable principles and methods; and (4) the expert has
reliably applied the principles and methods to the facts of the
case.  The Supreme Court has established a two-part test for
determining the admissibility of expert testimony: (1) the trial
court must make a preliminary assessment of whether the reasoning
or methodology underlying the testimony is scientifically valid and
of whether that reasoning or methodology properly can be applied to
the facts in issue; and (2) the court must ensure that the proposed
expert testimony is relevant and will serve to aid the trier of
fact.  See United States v. Finley, 301 F.3d 1000, 1008 (9th Cir.
2002).

     Expert testimony, therefore, must be both relevant and
reliable.  Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589

**United States District Court**
For the Northern District of California

1   (1993).  When considering evidence proffered under Rule 702, the

2   district court must act as a gatekeeper by making a preliminary

3   determination that the expert's proposed testimony is reliable.

4   Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141, 150 (1999).  The

5   Ninth Circuit's policy on admissibility is liberal, though the

6   district court must focus on the proposed evidence's scientific

7   reliability and relevance instead of its persuasiveness.  See Ellis

8   v. Costco Wholesale Corp., 657 F.3d 970, 982 (9th Cir. 2011).  The

9   district court has broad latitude in both determining whether an

10  expert's testimony is reliable and deciding how to determine the

11  testimony's reliability.  Id.

12

13  **IV.  DISCUSSION**

14      **A.   Defendants' Motion to Exclude**

15      Defendants move to exclude the testimony of Plaintiff's

16  expert, Ramaswami Vasudevan.  Mr. Vasudevan is a forensic engineer

17  with over forty years of experience in the field.  ECF No. 66-2

18  ("Vasudevan Decl.") ¶¶ 3-5.  He used finite element analysis

19  ("FEA") to estimate the temperature that the motor in the subject

20  fan likely reached.  FEA is a mathematical modeling technique that

21  engineers use to measure values that are difficult to ascertain

22  through physical testing.  Defendants raise two main issues with

23  Mr. Vasudevan's application of FEA in this case.

24          **1.   FEA Generally**

25      Defendants attack FEA generally as a reliable method.  Their

26  criticism is based solely on a Sixth Circuit case that affirmed a

27  district court's exclusion of an expert who had used FEA.  See

28  Defs.' 702 Mot. at 19-20; Coffey v. Dowley Mfg., Inc., 89 F. App'x

United States District Court
For the Northern District of California

927, 930 (6th Cir. 2003).  However, the Sixth Circuit's problem with the expert testimony in Coffey was not with FEA itself, but that the expert had failed to conduct any physical testing.  See id. at 930-31 ("Dr. Wilson has not performed any actual physical testing to evaluate the results of his second finite element analysis.").  Here, Mr. Vasudevan did verify his FEA modeling system with actual physical testing.

### 2.   Testing and Verification

The computer model that an engineer uses to estimate variables through FEA must be verified against real-world testing.  In this case, the subject fan was severely damaged in the fire and could not be tested.  So Mr. Vasudevan used a different fan (the "workshop fan") that he found in a workshop in the basement of the Franciscan Towers.  ECF No. 59-3 ("Vasudevan Depo. I") at 66:4-16. Defendants argue that the workshop fan was too dissimilar from the subject fan to provide adequate verification.  Defendants point out that the workshop fan was 10-15 years old, and its motor drew a different wattage than the subject fan, and drew 60 watts of power in a locked rotor condition (compared to 52 watts for the subject motor).  Mr. Vasudevan, however, testifies that the subject fan was substantially similar to the workshop fan.  See Vasudevan Depo. I at 64:13-23, 66:4-7.  Mr. Vasudevan also makes it clear that he accounted for differences in size, wattage, material, and other variables in the motors when he conducted his FEA.  ECF No. 66-3 ("Vasudevan Depo. II") at 92:25-94:21.  Essentially, the workshop fan was not intended to be identical to the subject fan; its purpose was merely to verify Mr. Vasudevan's model.  Defendants' expert, James Finneran, testified at his deposition that "fans are

United States District Court
For the Northern District of California

not complicated" and that it is possible for an experienced engineer to transfer knowledge about one model of fan to another. ECF No. 66-4 ("Finneran Depo.") at 50:23-51:25.[2]

Defendants also take issue with the convection coefficient that Mr. Vasudevan calculated.  The convection coefficient, also known as the heat transfer coefficient, is a characteristic of the heat transfer between the motor and the surrounding air.  As the motor transfers more of the heat it produces to the surrounding air, the convection coefficient increases, and the fan runs cooler. Mr. Vasudevan conducted a test with the workshop motor by putting the motor in a ceramic box and then draping a blanket over the box. The purpose of the box and blanket was to reduce airflow to the motor, because increased airflow could increase the convection coefficient.  ECF No. 96 ("Tr.") at 52:7-21.  Mr. Vasudevan's test revealed a convection coefficient of 23.75, but he used a convection coefficient of 20 in his FEA model as the value for a brand new motor of the type of the subject motor.  Id. at 56:13-57:25.  Defendants argue that that makes no sense, because removing the blanket should increase airflow and therefore increase the convection coefficient.  See Defs.' 702 Mot. at 21-22.  They claim

_____

[2] In its opposition brief, Plaintiff makes some very specific allegations regarding Mr. Finneran's statements at his deposition, including that he agreed that Mr. Vasudevan's workshop motor was "similar" and "close" to the subject motor and that Mr. Finneran did not object to Mr. Vasudevan's use of the subject motor. However, the citations Plaintiff provides are to a section of the deposition in which Mr. Finneran appears to be listing other cases in which he served as an expert.  See Pl.'s 702 Opp'n at 10-11; Finneran Depo. at 47:10-25, 48:1-11.  The more specific statements Plaintiff discusses do not appear anywhere in the excerpt of the deposition provided.  See Finneran Depo.  The Court admonishes the parties not to make such assertions unless they can be supported with evidence.

1  that "Vasudevan's selection of a convection coefficient value is
2  nothing more than a guess." Id. at 22.

3      Defendants misunderstand Mr. Vasudevan's intentions.  First of
4  all, the figure of 20 was for a brand new motor of the type of the
5  subject motor with static airflow. Tr. at 59:24-60:10.  Thus
6  airflow that managed to enter the ceramic box despite the presence
7  of the blanket would have increased the convection coefficient of
8  the workshop motor, as did remnants from the high-speed tests that
9  Mr. Vasudevan conducted. Id. at 52:3-12, 59:1-20.  Second, the
10 subject motor drew less power than the workshop motor.  Finally,
11 Mr. Vasudevan, testified that his use of 20 as the convection
12 coefficient for the subject fan was not a guess, but an inference
13 based on engineering literature, peer reviewed papers, the
14 Mechanical Engineer's Handbook, and other textbooks. Id. at 60:4-
15 10.

16      **3.   Assumptions of the Existence of Lint**

17      Defendants also repeatedly argue that there are problems with
18 Mr. Vasudevan's assumption of the existence of lint on the subject
19 motor.  Defendants point out that Mr. Vasudevan determined that the
20 subject motor operated with a convection coefficient of between
21 13.5 and 10 at the time of the fire.  Defendants argue that each of
22 those figures assumes at least some unknown amount of lint on the
23 fan, but Mr. Vasudevan has no opinion as to how much lint was on
24 the fan.  Therefore, Defendants argue, Mr. Vasudevan's results are
25 based on an unwarranted assumption, and his tests are not
26 reproducible.  Defendants also point out that the temperatures that
27 correspond to these convection coefficients -- 279° C (534° F) for
28 a coefficient of 13.5 and 368° C for a coefficient of 10 (694° F)

**United States District Court**
For the Northern District of California

1  -- span a range of almost 100° C.

2      Defendants' argument is again based on a misunderstanding of

3  Mr. Vasudevan's testimony.  Mr. Vasudevan explains that the

4  convection coefficients he used correspond to a range of no, or

5  negligible, lint (at 13.5) to lint that almost completely impedes

6  heat transfer (at 10).  Tr. at 61:24-62:18, 68:22-69:13, 91:12-21.

7  Defendants argue that Mr. Vasudevan apparently testified at his

8  deposition that the 13.5 coefficient assumes the presence of <u>some</u>

9  lint on the fan.  But Mr. Vasudevan explained at the hearing that

10  the 13.5 figure was derived from the Underwriters' Laboratories

11  ("UL") tests, which use fans on which lint has not built up.  <u>Id.</u>

12  at 63:6-17.  However, even a brand new fan can collect a negligible

13  amount of lint during the manufacturing, shipping, and handling

14  process.  <u>Id.</u> at 7:8-16.  Accordingly, Mr. Vasudevan's statement

15  that the 13.5 coefficient might have accounted for some amount of

16  lint is explained because even the brand new fans used in UL

17  testing may have had a negligible amount of lint on them.[3]

18  Regardless, Mr. Vasudevan made it clear, repeatedly, that his

19  temperature range corresponds to a minimum that assumes no (or a

20  negligible amount of) lint and a maximum that assumes a large

21  buildup of lint.  Thus, Mr. Vasudevan's conclusions do not require

22  an assumption that lint was present, nor are they based on

23  unsubstantiated assumptions.

24  ///

25

26  [3] The difference between the 13.5 figure that Mr. Vasudevan derived
   for the subject motor and the 20 figure he used for a brand new

27  motor of the same type is explained by the "other conditions" he
   accounted for, including the age of the subject motor and the

28  degradation he observed.  <u>See</u> Tr. at 68:11-14; 20:9-18, 29:4-20.

### 4. <u>Conclusion as to Mr. Vasudevan</u>

For the reasons discussed above, the Court finds that Mr. Vasudevan used reliable methodology and applied it reliably in this case.  Moreover, his testimony is relevant.  His opinion is that the subject motor reached a temperature high enough to start the fire at issue in this case.  Defendants' motion to exclude his testimony is DENIED.

### B. <u>Defendants' Motion for Summary Judgment</u>

Defendants' motion for summary judgment is premised upon the Court's exclusion of Mr. Vasudevan's testimony.  Because the Court denied Defendants' motion to exclude, the motion for summary judgment is also DENIED.

### C. <u>Plaintiff's Motion to Exclude</u>

Plaintiff moves to exclude the testimony of Defendants' expert, James Finneran.  Mr. Finneran is an electrical engineering technologist.  He has over thirty years of experience examining electrical equipment for defects and failures.  ECF No. 81-2 ("Finneran Decl. I") ¶¶ 1, 6, 8.  Mr. Finneran followed the UL protocols for testing overheating protection for motors.  He found that none of the motors he tested reached temperatures high enough to ignite when they were placed in a locked rotor condition.

### 1. <u>Untimely Supplemental Disclosures</u>

Plaintiff first objects that Mr. Finneran's second expert report was untimely.  Defendants argue that Mr. Finneran's second report was a supplemental report and therefore not untimely.  The Court agrees that the report was a supplemental report, but is mystified as to why Defendants would think that that fact makes the report timely.  The Court's scheduling order of March 18, 2014 set

**United States District Court**
For the Northern District of California

1   a deadline of September 30, 2014 for supplemental expert reports,

2   and Mr. Finneran's supplemental report was not produced until

3   October 20, 2014.  See ECF No. 43 ("Scheduling Order"); Finneran

4   Decl. I ¶ 3.

5       That said, an untimely supplemental report need not be

6   excluded if its late production is harmless.  See Fed. R. Civ. P.

7   37(c)(1); Yeti by Molly, Ltd. v. Deckers Outdoor Corp., 259 F.3d

8   1101, 1106 (9th Cir. 2001) ("The information may be introduced if

9   the parties' failure to disclose the required information is

10  substantially justified or harmless.").  Defendants have explained

11  that Mr. Finneran's supplemental report contains no new opinions;

12  it only provides additional testing data.  Mr. Finneran conducted

13  the additional testing to determine whether his test motors would

14  reach hotter temperatures if held in a locked rotor condition for a

15  longer time period.  Plaintiff has failed to demonstrate any

16  prejudice as a result of the untimely disclosure.  For example,

17  Plaintiff asserts that "[t]he strategic decision not to properly

18  disclose [Mr. Finneran's supplemental report] is not harmless

19  because it violated the Court's scheduling order and Rule 26."

20  Pl.'s 702 Mot. at 9.  It is unclear why violation of the Court's

21  scheduling order in and of itself harms Plaintiff.  The only

22  prejudice Plaintiff claims as a result of Mr. Finneran's untimely

23  report is that the report was disclosed after Plaintiff deposed Mr.

24  Vasudevan.  But Mr. Vasudevan is Plaintiff's own expert.  It is

25  unclear why Plaintiff would need to depose its own expert to

26  ascertain his thoughts on Mr. Finneran's supplemental report.

27      Thus even though Mr. Finneran's supplemental report was

28  untimely, the Court will not exclude it.

**United States District Court**
For the Northern District of California

### 2.   Compliance with UL Testing Procedures

Mr. Finneran conducted tests according to procedures prescribed by UL.  Plaintiff argues that Mr. Finneran deviated from the UL requirements in several important ways.  First, Plaintiff points out the Mr. Finneran did not document that he conducted a dielectric voltage withstand test.  However, Mr. Finneran testified that he did conduct the test, and that his notes reflect that the resistance of the motor coil -- what the dielectric voltage withstand test measures -- was fine.  ECF No. 81-12 ("Finneran Depo.") at 158:18-156:14.

Second, the UL protocols specify that the tester should lock all three motors used in the test and then proceed to test the motor with the highest wattage.  Mr. Finneran instead only measured the combined total wattage of the motors he used and calculated the average (which assumes that the wattage of all the motors was the same).  This deviation from the UL standards is easily explained. First, Mr. Finneran used six motors rather three.  Second, he proceeded to test all six motors.  As a result, it is unclear why Plaintiff takes issue with Mr. Finneran's failure to identify the highest wattage motor.  See Finneran Depo. at 157:7-158:20. Because Mr. Finneran tested all six motors, there was no need to identify the motor using the highest wattage and test only that motor.

Third, Plaintiff argues that Mr. Finneran failed to properly document how he measured the interior temperatures of his test motors.  However, Mr. Finneran has testified as to how he attached the thermocouples (which he used to measure the temperature) to the coils.  Id. at 160:21-162:16.

**United States District Court**
For the Northern District of California

1    Fourth, Plaintiff argues that Mr. Finneran was required to rub

2 the insulation on the motors to determine whether the insulation

3 had degraded.  The UL test, however, does not require the tester to

4 rub the insulation with his thumb; it merely provides flaking of

5 material upon rubbing as an example of deterioration.  See ECF No.

6 77-5 ("UL Protocols") at 12C.  Instead, Mr. Finneran visually

7 inspected the insulation and determined that no deterioration had

8 occurred.  Finneran Depo. at 170:21-171:11.

9    Fifth, Plaintiff argues that Mr. Finneran covered the test

10 motors with two layers of cheesecloth, rather than one, and did not

11 document the specifications of the cheesecloth he used.  Mr.

12 Finneran has testified that the cheesecloth he used met the UL

13 specifications, and that he still has the packaging from the

14 cheesecloth used in the testing.  See Finneran Depo. at 176:3-15.

15 Additionally, Mr. Finneran put one layer of cheesecloth on two of

16 the motors and two layers on the other four.  Finneran Depo. at

17 177:3-15.  Plaintiff also argues that Mr. Finneran does not know

18 why the UL standards call for cheesecloth to be placed around the

19 motor.  It is not clear exactly why Plaintiff finds that

20 problematic; indeed Mr. Finneran recognizes that the effect of the

21 cheesecloth is to inhibit heat transfer and cause the motor to run

22 hotter.  Id. at 177:3-15.  Consequently, two layers of cheesecloth,

23 as opposed to one, would cause Mr. Finneran's tests to be more

24 likely to find that the subject motor could have started the fire.

25    Plaintiff argues that Mr. Finneran's alleged errors in

26 conducting the UL tests "paint a staggering picture of

27 unreliability as errors compound upon one another and the test

28 becomes truly impossible to reproduce."  Pl.'s 702 Mot. at 13.

1  That statement rings as strident hyperbole.  Two of the "errors"

2  Plaintiff alleges were actually the result of Mr. Finneran

3  conducting more thorough tests than the UL protocols require.  Two

4  were minor gaps in Mr. Finneran's documentation; Plaintiff

5  apparently desired more detailed documentation than Mr. Finneran

6  provides (though it is not explicitly required by the UL

7  standards); and one resulted from Plaintiff's misinterpretation of

8  the UL standards.  None of these supposed errors suggest that Mr.

9  Finneran applied the UL tests unreliably to this case.

10           **3.    <u>Mr. Finneran is a Technologist</u>**

11      Next, Plaintiff points out that Mr. Finneran's undergraduate

12  degree is in electrical engineering technology ("EET"), as opposed

13  to electrical engineering ("EE").  A degree in engineering

14  technology confers the title of "technologist" rather than

15  "engineer."  <u>See</u> ECF No. 77 ("Bauman Decl.") Ex. D.  Plaintiff also

16  argues that Mr. Finneran has not taken any courses in

17  thermodynamics and that he has not memorized the laws of

18  thermodynamics (though Mr. Finneran testified to his familiarity

19  with the principles of thermodynamics via his work experience).

20  Armed with the fact that Mr. Finneran is a technologist, Plaintiff

21  proceeds to cast various aspersions on Mr. Finneran's ability to

22  understand Mr. Vasudevan's conclusions.  <u>See</u> Pl.'s 702 Mot. at 14-

23  15.

24      The standard set by Rule 702 is permissive and flexible.  It

25  permits an expert to be qualified by his "knowledge, skill,

26  experience, training, or education."  Fed. R. Evid. 702.  The

27  difference between a degree in EET and one in EE is that an EET

28  degree is algebra-based, while EE is based on calculus.  Tr. at

182:17-24.  At the outset, it is important to note that Rule 702 does not require any particular degree (or any degree at all, for that matter) for an expert to be qualified.  Plaintiff states no reason why the fact that Mr. Finneran's college degree was grounded in algebra rather than calculus should disqualify him.  Moreover, Mr. Finneran's extensive experience and professional certifications certainly qualify him to offer the opinions he has provided in this case.  He has spent over thirty years analyzing various electrical devices, including motors and fans, for laboratories and consulting firms.  See ECF No. 81-2 ("Finneran Decl. II") ¶¶ 4-8.  Moreover, Mr. Finneran took additional mathematics courses in college beyond those required for his EET degree.  Tr. at 183:2-5.  The Court finds that Mr. Finneran's knowledge, skill, experience, training, and education are sufficient to qualify him as an expert in this case.

### 4.   **Mr. Finneran as a "Hired Gun"**

Next, Plaintiff argues that Mr. Finneran's testimony should be excluded because "it is tailor-made junk science on demand."  Pl.'s 702 Mot. 15.  Plaintiff does not acknowledge during its rant against Mr. Finneran that Plaintiff, too, hired experts -- in fact at least four experts -- for this case.  Plaintiff's argument, in those rare places where it is grounded in law rather than name-calling and ad hominem attacks, is based on two facts.  First, Mr. Finneran has testified on behalf of Broan-Nutone ten times in the last three years.  Second, a portion of Mr. Finneran's testimony was excluded by the United States District Court for the Northern District of Iowa in 2004 because the attorneys for the party that hired him consulted with him in violation of a pretrial order

**United States District Court**
For the Northern District of California

prohibiting him from communicating with others about what occurred in the courtroom.  See Pl.'s Rule 702 Mot. at 16; Zeigler v. Fisher-Price, Inc., 302 F. Supp. 2d 999, 1011 (N.D. Iowa 2004). Neither of these facts is persuasive.  It is unclear to what extent the blame for the violation of the order in Fisher-Price lies with Mr. Finneran or with the attorneys who hired him.  Even if it was Mr. Finneran's fault, that impropriety from 2004 does not preclude him from testifying as an expert ever again.  Nor does Mr. Finneran's history of testifying for Broan-Nutone.  While that may be a possible area for cross-examination, it does nothing to show Mr. Finneran is unqualified, that his methods were unreliable, or that he applied those methods unreliably in this case.  Even applying the "extra rigor" that Plaintiff urges is warranted, the Court cannot find that Mr. Finneran's testimony is barred by Rule 702.  See Pl.'s 702 Mot. at 15-16; Edmons v. Home Depot, U.S.A., Inc., No. CIV. 09-987-AC, 2011 WL 127165, at *6 (D. Or. Jan. 14, 2011).

### 5.    The Relevance of Mr. Finneran's Testimony

Finally, Plaintiff argues that Mr. Finneran's testimony is irrelevant.  In his tests, Mr. Finneran used new and unused motors that had been in a locked rotor condition for fifteen days (without cycling the power on and off) and free of lint accumulation.  By contrast, Plaintiff alleges that the subject fan was old and used, in a locked rotor condition for sixteen months (with power cycles as the tenants turned on and off the bathroom lights), and covered with lint.  Additionally, Mr. Finneran's test motors had ventilation openings around the circumference of the motor, while the subject motor had ventilation openings on the end shields.  At

**United States District Court**
For the Northern District of California

1   least two of those conditions are disputed: Defendants claim that
2   the subject motor was not in a locked rotor condition and was not
3   covered with lint.  Thus the fact that Mr. Finneran did not account
4   for those conditions does not necessarily render his findings
5   irrelevant.

6        With respect to the age of the motor, Mr. Finneran testified
7   that the subject motor was found to have a resistance of 50 ohms
8   and that the majority of its insulation was intact, even after the
9   fire.  Tr. at 130:15-131:5; 132:17-133:10.  Mr. Finneran also
10  testified that degradation alone does not increase temperature, but
11  if the insulation degrades to such a point that short circuits
12  result, the resistance decreases and the motor runs hotter.
13  Because there was no evidence of decreased resistance, the age of
14  the subject motor may not have caused it to run hot.  Id. at
15  157:23-158:12.

16       As for the lint on the motor, Mr. Finneran's opinion is that
17  the subject motor had actually not collected lint at all.  Id. at
18  138:13-139:22, 159:14-23.  That opinion is based on the fact that
19  there was no evidence on the subject motor (Mr. Vasudevan's theory
20  is that the lint burned up in the fire) and that the motors from
21  fans pulled from other apartments in the building did not have lint
22  on them.  Because Mr. Finneran's tests were based on his opinion
23  that there was no lint on the motor, the decision not to account
24  for lint in the tests does not render them irrelevant.

25       Regarding the length of time for which the rotor was locked,
26  this again may be an area for cross-examination, but it does not
27  make Mr. Finneran's findings irrelevant to this case.  Power
28  cycling, too, may be an area for cross-examination.  But as neither

**United States District Court**
For the Northern District of California

1 party has any idea how frequently the motor was turned on and off

2 during the sixteen months when its rotor was allegedly locked, this

3 seems to be a weakness that would affect any conceivable attempt to

4 duplicate the conditions under which the subject motor operated.

5      Finally, the Court addresses the differences in the location

6 of the ventilation openings.  Mr. Finneran testified that the

7 different locations, in and of themselves, do not cause changes in

8 the operating temperature of the motor.  Tr. at 168:17-169:13.

9 However, the UL test calls for putting cheesecloth around the

10 motor.  Because the ventilation openings on Mr. Finneran's test

11 motors were located around the circumference of the motors, the

12 cheesecloth covered the openings and caused the motors to run

13 hotter.  Tr. 167:3-168:16.  Had he performed exactly the same tests

14 on the subject motor, the results would have differed, because the

15 cheesecloth would not have covered the ventilation openings on the

16 end shield.  This difference, therefore, does not invalidate Mr.

17 Finneran's methodology.

18           **6.   Conclusion as to Mr. Finneran**

19      The Court finds that Mr. Finneran is qualified as an expert by

20 his knowledge, training, experience, and education.  He used

21 reliable methods and applied them reliable in this case.  Despite

22 the differences (both undisputed and alleged) in the conditions

23 under which Mr. Finneran conducted his tests and under which the

24 subject motor offered, Mr. Finneran's opinion have "a valid

25 connection to the pertinent inquiry."  <u>Primiano v. Cook</u>, 598 F.3d

26 558, 565 (9th Cir. 2010), as amended (Apr. 27, 2010).  Plaintiff's

27 motion to exclude Mr. Finneran's testimony is DENIED.

28 ///

**V. <u>CONCLUSION</u>**

For the reasons set forth above, both motions to exclude expert testimony are DENIED.  Defendants' motion for summary judgment is also DENIED.


IT IS SO ORDERED.


Dated: February 27, 2015                    
_____

UNITED STATES DISTRICT JUDGE